**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

Your Affiant, Stephen J. McGrath, deposes and states:

**INTRODUCTION AND AGENT BACKGROUND**

1.      This Affidavit is offered in support of an request for Complaints and Arrest Warrants for: Marcus **BROWN** ("**BROWN**"), Kardell **HENDERSON** ("**HENDERSON**"), Terence **MONTGOMERY** ("**MONTGOMERY**"), and Devontae **POTEAT** ("**POTEAT**") for violations federal law that took place on or about September 3, 2025, in East Cleveland, Cuyahoga County and the Northern District of Ohio, namely: Possession with the intent to distribute 400 grams or more of fentanyl (21 U.S.C. Sections 841(a)(1), (b)(1)(A), and 18 U.S.C. Section 2);  Possession with the intent to distribute 500 grams or more of cocaine (21 U.S.C. Sections 841(a)(1), (b)(1)(B), and 18 U.S.C. Section 2); Conspiracy to distribute and possess with intent to distribute 400 grams or more of fentanyl (21 U.S.C. Sections 841(a)(1), (b)(1)(A), and 846); and Conspiracy to distribute and possess with intent to distribute 500 grams or more of cocaine (21 U.S.C. Sections 841(a)(1), (b)(1)(B), and 846).

2.      Your affiant is a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, & Explosives, and has been since April of 2021. Your affiant completed training at the Federal Law Enforcement Training Center and the Bureau of Alcohol, Tobacco, Firearms, and Explosives National Academy. Previous to this position, your affiant served as an ATF Task Force Officer from July of 2018 until April of 2021. Prior to and while serving as a Task Force Officer with ATF, the Affiant was employed by the City of Cleveland, Ohio, Cleveland Division of Police (hereinafter "CDP") as a Basic Patrolman, a Detective with the CDP Gang Impact Unit, and as a Sergeant supervising the CDP Gang Impact Unit/ Operation Legend Task

1

Force. Formalized education prior to law enforcement includes advanced degrees of Bachelor's in the Science of Business Administration and a Master of International Business Administration (MBA). Affiant has participated and investigated numerous state and federal narcotics, criminal groups and gangs, and firearms investigations. Pursuant to 18 U.S.C. § 3051, your affiant is empowered to enforce criminal laws of the United States. As result of training and experience, your affiant is familiar with federal laws including the Target Offenses.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement personnel, and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

4.      ATF Cleveland and HSI Cleveland, accompanied by other federal and local law enforcement agencies, are conducting an investigation into the narcotics trafficking activities of Marcus **BROWN**, Kardell **HENDERSON**, Terence **MONTGOMERY**, Devontae **POTEAT** and others in and around the Northern District of Ohio.  On or about September 2, 2025, investigators obtained a search warrant authorizing the search of ***9 E. 134th St., East Cleveland, Ohio, for evidence of violations of federal drug laws (21 U.S.C. 841(a)(1) and 846).

**September 3, 2025, Execution of Search Warrant at ***9 E.134th St., East Cleveland, Ohio**

5.      On September 03, 2025, investigators executed a federal search warrant at ***9 E. 134TH St., East Cleveland, Ohio (1:25mj2156). Upon executing this search warrant, law enforcement found no occupants in the residence and found the residence to be a suspected drug

2

storage, manufacturing, preparation for distribution location and/or "stash" house.  All of the items and substances that investigators believed to be narcotics were submitted to the Cuyahoga County Regional Forensic Science Laboratory (CCRFSL). Below your affiant has outlined what was found in each room of the residence at ***9 E. 134TH St., East Cleveland, Ohio[1], during the execution of the above-referenced search warrant.

6.      During the early morning hours of September 03, 2025, in executing the above-referenced search warrant, law enforcement went to the residence of ***9 E. 134th St., East Cleveland, Ohio, approached the front door and knocked and announced their presence and purpose for being there. After several attempts to contact someone in the residence, forced entry was made.  Almost immediately, investigators observed a Vivint home security module affixed to the wall in the family room. This module has a screen and displays in real time video footage from exterior cameras on the residence. Law enforcement observed the module actively displaying a live video feed from the ring doorbell camera as they entered the residence.

7.      After law enforcement cleared the residence for people, they began searching this residence. Investigators discovered that the majority of the residence appeared to have been recently remodeled, it was furnished with large couches and television in the living room, the dining room did not have a table or any furniture, the kitchen did not have any kitchen supplies (plates, bowls, utensils, etc.) and/or food supplies that would demonstrate that anyone lived at the residence. The second floor had three bedrooms and a bathroom.

8.      Upon searching the living room, investigators found a box labeled "Winchester"

---

[1] This outline of items recovered by investigators from ***9 E. 134th St., East Cleveland, Ohio is not all inclusive of all items recovered and serves simply as a summary to outline of the items directly related to controlled substances and the target offenses.

3

found to contain (11) live rounds of ammunition. In the dining room, investigators found a large bag containing a large amount of suspected marijuana and a digital scale[2] with suspected drug residue on it. In the kitchen investigators found plastic bags containing suspected marijuana; a plastic bag containing pills later found to be approximately **5.84 grams** of a mixture containing fentanyl; a vacuum sealer[3], a digital scale with suspected drug residue on it; plastic packaging suspected of being used for packaging kilogram quantities of controlled substances[4]; and a glass plate from the microwave with suspected drug residue on it[5].

9.      The first second floor bedroom was set up like an office with a desk, chair, bookshelves, and inside the closet were multiple jackets/coats and shoes. On top of the desk were miscellaneous items to include mail, receipts, and boxes of cologne. Inside of the jacket/coat pockets investigators found six individually packaged plastic sandwich bags containing: **126.74 grams** of Cocaine (See Exhibit #01); **10.44 grams** of Cocaine-Base ("crack"); **3.42 grams** of Cocaine; **4.62 grams** a mixture containing Fentanyl; **31.88 grams** of Cocaine Base ("crack"); and a plastic bag containing a white powder that did not test positive for controlled substance but appeared to be packaged as such. Investigators also documented that the bookshelf had at least 16 bottles of Promethazine (See Exhibit#02). Based upon your

---

[2] Affiant knows in his training and experience persons engaged in the illegal sale of controlled substances often employ scales to weigh sellable quantities of controlled substances.

[3] Affiant knows in his training and experience that persons engaged in the illegal trafficking of controlled substances often employ similar vacuum sealers in the packaging of controlled substances for later distribution and/or the packaging of drug proceeds (currency).

[4] Affiant knows in his training and experience these items are often referred to as kilogram wrappers and or casques, and their appearance is consistent with having previously held a tightly sealed block like item, similar in size and shape to a kilogram quantity of compressed illegal drugs.

[5] Affiant knows in his training and experience that person engaged in the sale of cocaine will commonly "cook" cocaine into the base form ("crack"), in order to achieve this a heat source is required, such as a microwave and/or stovetop.

affiant's training and experience, the packaging of the controlled substances and the large amount of Promethazine demonstrates that the person in possession of these items is engaged in the distribution of controlled substances, not personal use. Investigators also located a piece of mail with the name "Terence **MONTGOMERY**" on it with "***9 E. 134th St., Cleveland, Ohio 44112".



(Exhibit #01)                              (Exhibit #02)

10.     The second bedroom was set up like a drug manufacturing and preparation for distribution room. There were two dressers in this room, a safe, several bags to include a suitcase, and a small closet. Most items, the floor, and walls in this room were covered in a white powder believed to be drug residue. In each of these locations, investigators found individually packaged amounts of controlled substances. Found in the dresser drawers and/or on

top of the dressers was a firearm[6], two breathing respirators[7] that appeared to have been used,

and processing and packaging materials to include sifters, blenders, bowls, scales, plastic bags[8],

amongst other items.  There was no evidence of the dressers, safe, suitcase, or bags being used

for anything but the storage and processing of pre-packaged distribution quantities of controlled

substances and the tools of drug manufacturing and preparation.  On the floor of the room,

investigators found an additional breathing respirator and a drug press[9] with a plate labeled

"The Brick Press".  (See Exhibit #03 – 08 for examples of what was found in the second

bedroom)

---

[6] Affiant knows in his training and experience that persons engaged in the trafficking of controlled substances often possess firearms to protect themselves, supply of controlled substances, and proceeds, in the dangerous activity of illegal drug sales.

[7] Affiant knows in his training and experience, that persons engaged in the mixing of dangerous drugs, often employ similar respirators and or breathing protection to protect themselves from inhaling harmful street drugs.

[8] Affiant knows in his training and experience that it is common for persons engaged in the illegal street drug sales to add a filler noncontrolled substance ("cut and/or cutting") to an amount of controlled substance to increase the sellable quantity and thus increase proceeds. Further, it is common for persons engaged in the cutting of controlled substances to use common household items such as bowls, sifters, and mixers.  Likewise, a common item used in the packaging of sellable quantities of controlled substances is to employ plastic bags.

[9] Affiant knows in is training and experience, that it is common for persons engaged in illegal street drug sales, to employ similar press devices, to compress controlled substances, after "cutting" process.

6





(Exhibit #03)

(Exhibit #04)





(Exhibit #05)

(Exhibit #06)

7



(Exhibit #07)                    (Exhibit #08)

11.    In the second bedroom, investigators found numerous bags of drugs throughout the room, to include:

- Black plastic bag containing rock like substance found to be approximately **501.09 grams** of cocaine, found under an air mattress;

- Bag containing brown powder found to be approximately **1.57 grams** of fentanyl mixture, found in a safe;

- Bag containing white substance found to be approximately **5.43 grams** of fentanyl mixture, found under an air mattress;

- Bag containing blue pills found to be approximately **198.62 grams** of fentanyl mixture, found in the closet;

- Bag containing white powder found to be approximately **.76 grams** of fentanyl mixture, found in second drawer of tall dresser;

- Bag containing rock like substance found to be approximately **16.47 grams** of cocaine base ("crack");

- Bag containing tan rock like substance found to be approximately **161.68 grams** of fentanyl mixture;

- Bag containing grey rock like substance found to be approximately **152.48 grams** of fentanyl mixture, found in the closet;

8

- Bag containing brown powder found to be approximately **3.97 grams** of fentanyl mixture, found in a safe;

- Bag containing white powder found to be **11.09 grams** of cocaine, found under air mattress;

- Bag containing white powder found to be approximately **20.68 grams** of fentanyl mixture, found in the tall dresser, in the second drawer;

- Bag containing brown powder found to be approximately **6.11 grams** of fentanyl mixture, found in the safe;

- Bag containing brown rock like substance found to be approximately **23.21 grams** of fentanyl mixture, found in tall dresser;

- Bag containing off white powder found to be approximately **39.64 grams** of fentanyl mixture, found in tall dresser, in the second drawer;

- Bag containing brown rock like substance found to be approximately **9.42 grams** of fentanyl mixture, found in tall dresser, in the second drawer;

- Bag containing brown powder found to be approximately **1.65 grams** of fentanyl mixture, found in the bedroom safe;

- Bag containing a white rock like material found to be approximately **83.79 grams** of 4ANPP;

- Bag containing brown powder found to be approximately **6.56 grams** fentanyl mixture, found in tall dresser, in the second drawer;

- Bag containing brown rock like substance found to be approximately **11.7 grams** of fentanyl mixture, found under air mattress;

- Bag containing brown rock like substance found to be approximately **46.52 grams** of fentanyl mixture;

- Bag containing brown substance found to be approximately **81.42 grams** of fentanyl mixture;

- Bag containing brown block shaped substance found to be approximately **74.68 grams** of fentanyl mixture;

- Bag containing a white powder found to be approximately **.59 grams** of cocaine, found under an air mattress;

- Bag containing a brown powder found to be approximately **34.02 grams** of fentanyl, found in a safe;

- Bag containing a block of a brown substance found to be approximately **117.64 grams** of fentanyl, found in a tall dresser;

- Bag containing a brown rock like substance found to be approximately **10.14**

**grams** of fentanyl mixture, found under an air mattress.

12.     The third bedroom was set up like a livable bedroom with a bed and a dresser but the dresser did not contain any clothing and the room did not have additional items that would be consistent to being a person's permanent residence. This bedroom may have been used by someone to spend the night periodically based upon your affiant's observations of the room. In this room, investigators found glass bowls with white powder residue, several bottles of Promethazine, a vacuum sealer, and several plastic bags containing suspected marijuana; a plastic bag containing approximately **1.51 grams** of containing Methamphetamine;  a plastic bag containing approximately **99.83 grams** of a mixture containing Fentanyl; a plastic bag containing approximately **40.08 grams** of a mixture containing Fentanyl; and a plastic bag containing **475.04 grams** of Cocaine. The plastic bags containing controlled substances were found in a clothes hamper and an empty shoe box. (See Exhibit #09).



(Exhibit #09)

13.     In the upstairs hallway between the bedroom's, investigators found plastic

packaging suspected of being used for packaging kilogram quantities of controlled substances

based upon your affiants training and experience. (See Exhibit #10)



(Exhibit #10)

14.     While investigators searched the residence of ***9 E. 134th St., East Cleveland,

Ohio they located used and boxes of new, unused latex gloves throughout the residence to

include in the kitchen and the bedrooms. Your affiant knows that people engaged in the

manufacturing, preparation, and distribution of controlled substances often use latex gloves

when handling dangerous controlled substances.

**Search Warrant of Vivint Home Security System Module obtained from September
03, 2025, execution of search warrant at ***9 E. 134th St., East Cleveland, Ohio**

15.     On October 01, 2025, United States District Court for the Northern District of Ohio Magistrate Judge E. Grimes Jr. authorized a search warrant for the search of the Vivint security camera module (1:25mj2168) that was recovered by law enforcement upon executing the federal search warrant at ***9 E. 134th St., East Cleveland, Ohio on September 03, 2025. Upon executing this warrant, over 200 approximately 10 to 30 second video clips were retrieved from this device. The video clips were captured by a camera affixed to the front of the residence near the front door commonly referred to as a "doorbell camera" and two cameras affixed to the exterior of the residence. The clips were found to have been recorded on the days leading up to law enforcements residential search warrant execution at ***9 E. 134th St., East Cleveland, Ohio dating August 29, 2025 through September 03, 2025.

16.     Law enforcement carefully reviewed each video clip in conjunction with additional physical and electronic surveillance and determined that there were five males, Marcus **BROWN**, Kardell **HENDERSON**, R.H. (a person known to investigators and specifically not included herein at this time), Terence **MONTGOMERY**, and Devonte **POTEAT**, who maintained access, control, and possession over the residence. This was determined by the number of visits, arrivals and departures, the use of keys to enter upon arrival and secure the residence upon departure, conversations captured by the recordings, and behaviors by the subjects that based upon my training and experience are consistent with individuals operating a drug stash house. These observations included hand-to-hand transactions, carrying bags in and out of the residence, and short departures from the residence to conduct short meetings with people on streets near to the residence and immediately returning to the residence. These five individuals were the only people who were observed arriving independently of others

as not to appear to be guests.  These males were also observed carrying household items into the residence to include food, beverages, and toilet paper.

**Vivint Security System Video Clip Observations and Law Enforcement Surveillance
***9 E. 134th St., East Cleveland, Ohio**

17.     August 29, 2025, at approximately 4:33 pm, is the earliest video clip obtained from the Vivint Security System module. The following is a summary of what investigators observed from the video clips obtained from the Vivint home security module on August 29, 2025. All of the times are approximate, recorded statements are not verbatim and not intended to be a transcript, and the video, which is stored in ATF evidence, is the most accurate representation of the activity described below.

      a.  At 4:33 pm, **R.H.** was observed entering the front door of the residence wearing an all grey sweatsuit, white t-shirt, and mostly black tennis shoes. This is the first time **R.H.** was positively identified by law enforcement entering the residence (See Exhibit #11).



(Exhibit #11 – **R.H.**)

b.  At 4:39 pm, **POTEAT** was observed entering the front door of the residence

wearing grey Nike sweatpants, a white t-shirt, and white shoes and then departed

wearing the same sweatpants and a grey track jacket to match overtop of the white t-

shirt. This was the first observation of **POTEAT** entering and exiting the residence

(See Exhibit #12). A white SUV was backed into the driveway at the same time and

a red Jeep was parked in the street.



(Exhibit #12 – **Devonte POTEAT**)

c.  At 4:39 pm, **R.H.** exited the residence and walked to the street.

14

    d.  At 4:39 pm, **MONTGOMERY** was observed approaching the front porch from the driveway, where the white SUV[10] had backed into moments before. He entered the front door of the residence wearing an all black sweatsuit and white tennis shoes. **MONTGOMERY** walked onto the front porch at the same time that **R.H.** was approaching the residence and they were heard conversing, but investigators were unable to make out what they said. **MONTGOMERY** was carrying a pack of toilet paper, a cellphone[11], and a black plastic bag (See Exhibit #13).



(Exhibit #13- **Terence MONTGOMERY**)

    e.  At 4:40 pm, **R.H.** returned and entered the front door.

---

[10] On August 29, 2026, Terence **MONTGOMERY** was observed parking a white Buick Enclave SUV bearing Minnesota license plate ***248 on the street in front of the ***9 E. 134th St. residence before exiting the vehicle and walking into the residence.
[11] Affiant knows in his training and experience that persons engaged in drug trafficking commonly use cellular phones to coordinate drugs sales and/or purchase of drug supply.

f. At 4:57 pm, **POTEAT** exited the residence and walked to the street.

g. At 5:06 pm, **POTEAT** entered the front door of the residence, and used keys to unlock the front door. **POTEAT** was holding a cell phone in his hand as he approached the door (See Exhibit #14).



(Exhibit #14 – **Devonte POTEAT**)

h. At 5:36 pm, **MONTGOMERY** exited the residence as a male, known to this investigation but not believed to be engaged in the operation of the stash house, approached the front door. **MONTGOMERY** was heard speaking to this male stating "you about to come in?" **MONTGOMERY** then walked to the driveway and the male entered the front door.

i. At 5:37 pm, **R.H.** exited the residence and was heard stating "That was mine wasn't it, *igga shorted me to" as he walked toward the street where the red Jeep Grand

16

Cherokee was parked. He then stopped once reaching the sidewalk and reached into his pocket when the honk of a car horn was heard and the lights on the red Jeep Grand Cherokee flashed.

j.  At 5:37 pm, **MONTGOMERY** walked onto the front porch from the driveway with his hand in his pocket. The sound of a car honk can be heard as if he was locking a vehicle. **MONTGOMERY** then entered the front door.

k.  At 5:38 pm, **R.H.** entered the residence through the front door.

l.  At 5:39 pm, the same male from before that is not believed to be engaged in operating the stash house exited.

m.  At 5:42 pm, **POTEAT** walked out of the front door and approached his vehicle parked on the street in front of the residence.

n.  At 5:50 pm, **POTEAT** returned to the residence, approached the front door with a cellphone in his hand, retrieved mail from a mailbox which is affixed to the front of the house to the right of the front door, and then used keys to gain entry into the front door (See Exhibit #15).



(Exhibit #15 – **Devonte POTEAT**)

o.  At 5:55 pm, **POTEAT** exited the front door and went to his vehicle parked on the street in front of the house with nothing in his hands. He returned moments later and entered the front door carrying a cellphone in his hand.

p.  At 6:02 pm, **HENDERSON** exited a white Volvo XC90 that he parked in the driveway and approached the front door wearing a white t-shirt, jeans with tears and/or rips, and white and orange shoes. **HENDERSON** was holding a cellphone and used keys to enter the front door. This was the first time **HENDERSON** was captured on video at the residence (See Exhibit #16 and #17).



(Exhibit #16 – **Kardell HENDERSON**)

18



(Exhibit #17- **Kardell HENDERSON**)

q. At 6:10 pm, **HENDERSON** exited the residence and opened the front door to the

   Volvo XC90.

r. At 6:34 pm, **MONTGOMERY** exited the residence and walked to the driveway.

s. At 6:35 pm, the white Buick SUV pulled up the driveway from the back of the

   residence at the same time as **R.H.** exited the front door. **R.H.** then entered the front

   passenger seat of the white Buick SUV.

t. At 7:00 pm, **MONTGOMERY** and **R.H.** walked from the driveway where the

   white Buick SUV was parked and approached the front door. **MONTGOMERY**

19

used keys to enter the front door and **R.H.** carried a white plastic bag and water bottle as he entered after **MONTGOMERY.**

u.  At 7:00 pm, **HENDERSON** used keys to enter the front door. He was holding a cellphone up to his ear as he entered.

v.  At 7:15 pm, **POTEAT** exited the front door with a cell phone and a cup in his hand.

w.  At 7:19 pm, **BROWN** exited a black Audi SUV approached the front door wearing black pants, a mostly white sweatshirt, and red and black shoes. **BROWN** used keys to enter the front door.

x.  At 7:21 pm, **BROWN** exited the residence and entered the driver door of the black Audi SUV.

y.  At 7:56 pm, **POTEAT** returned to the residence parking a new model grey colored Hyundai Kona in the driveway. He approached the front door while using a white or grey colored Apple iPhone. **POTEAT** used keys to gain entry into the front door. Approximately two minutes later, **POTEAT** exited the residence talking on a cellphone and departed in the grey Hyundai Kona (See Exhibit #18 & #19).



(Exhibit #18 – **Devonte POTEAT**)



(Exhibit #19 – **Devonte POTEAT**)

z.  At 8:17 pm, **POTEAT** returned to the residence and approached the front door while talking on a cellphone. **POTEAT** used keys to gain entry into the front door.

aa. At 9:58 pm, **POTEAT** exited the front door. He returned approximately six minutes later and entered the front door.

bb. At 10:11 pm, **R.H.** exited the residence and walked toward the red Jeep Grand Cherokee.

cc. At 11:07 pm, an unknown male approached the front door and knocked on the door. Approximately twelve minutes later, the unknown male exited the residence.

dd. At 11:28 pm, **R.H.** approached the front door and used keys to enter the front door.

ee. At 11:54 pm, **R.H.** exited the residence.

18.  Law enforcement reviewed the Vivint Security System module recordings from August 30, 2025. The following is a summary of what investigators observed on August 30, 2025. All of the times are approximate and the video which is stored in ATF evidence is the most accurate representation of the activity described below.

a.  At 12:25 am, **POTEAT** exited the residence carrying several items in his hands to include a black bag and was talking on a cellphone. He walked toward the street where his vehicle was parked.

b.  At 12:26 am, **MONTGOMERY** exited the front door and stated to **POTEAT**, "who in this car right here, who in this?". **MONTGOMERY** was carrying what appeared to be a carry-out food box and used the keys to secure the front door to include the storm door.

c.  At 1:48 pm, **BROWN** arrived at the residence in a BLACK AUDI SUV. **BROWN** entered the front door of the residence using keys (See Exhibit #20) while a black GMC pick-up truck was backing into the driveway. **BROWN** was wearing black jeans and a white t-shirt. **BROWN** then walked out the front door and engaged the operator of the GMC pick-up verbally from the front porch. The operator of the GMC pick-up then followed **BROWN** into the residence. A short time later, **BROWN** and the operator of the GMC pick-up carried a flat screen tv box out of the front door and loaded it into the GMC pick-up. **BROWN** then walked back into the house and then out again. When **BROWN** walked back out of the residence he locked both the interior door and the exterior security door.

23



(Exhibit #20- **Marcus BROWN**)

d.      At 1:54 pm, **BROWN** walked back to the front door and unlocked the door with

the operator of the GMC pick-up following him. **BROWN** can be heard stating "my

*igga father used to rent this house, now we rent it"[12] as they entered the front door.

One minute later, **BROWN** and the GMC pick-up truck operator exited the residence

carrying a green box. **BROWN** then locked the door again. Both males walked to their

respective vehicles and departed.

e.      At 2:49 pm, **BROWN** returned in the BLACK AUDI SUV, parked in the

driveway, and entered the residence using keys at the front door. Approximately eight

---

[12] Law enforcement believes that **BROWN** is referring to Terence **MONTGOMERY**'s father,
Terence **MONTGOMERY** Sr.

minutes later, **BROWN** exited the front door and locked the door with keys. **BROWN** then departed in the BLACK AUDI SUV.

f.      At 3:00 pm, **R.H.** arrived operating the red Jeep Grand Cherokee and entered through the front door using keys. He was wearing a grey sweatsuit, white T-shirt, and white and black shoes.

g.      At 3:15 pm, a black SUV arrived and parked in the driveway. A male, known to investigators but not herein mentioned, entered the residence through the front door. He was wearing a green sweatsuit, white T-shirt, and boots and was carrying several cellphones in his hand.

h.      At 3:29 pm, **POTEAT** arrived at the residence and used keys to gain entry into the residence. Approximately three minutes later, **POTEAT** exited the residence while operating a black flip cellphone and walked toward the street (See Exhibit #21).



(Exhibit #21- **Devonte POTEAT**)

i.      At 3:34 pm, the known male but not herein mentioned exited the front door and departed in the black SUV.

j.      At 3:38 pm, **R.H.** exited the residence and walked to the red Jeep Grand Cherokee parked in the driveway. Approximately one minute later, the white Buick SUV arrived and parked on the street in front of the residence.

k.      At 3:51 pm, the red Jeep Grand Cherokee departed.

l.      At 3:55 pm, **BROWN** arrived in the BLACK AUDI SUV, parked in the driveway, and approached the front door using keys to enter the residence with cellphones in his hand (See Exhibit #22).



(Exhibit #22 – **Marcus BROWN**)

m.      At 4:02 pm, **POTEAT** returned to the residence and entered the front door using keys to gain entry with food and beverage items in hand.

n.      At 4:20 pm, **MONTGOMERY** was observed coming from the street near where the white Buick Enclave was parked and a car horn can be heard when the lights on the Buick SUV flashed as if he locked the vehicle. **MONTGOMERY** entered the front door of the residence using keys to unlock the door. **MONTGOMERY** was carrying black plastic bags and a cellphone.

o.      At 4:38 pm, **BROWN** walked out of the front door and departed in the BLACK AUDI SUV.

p.      At 5:05 pm, BLACK AUDI SUV arrived and parked in the driveway.

q.      At 5:11 pm, **BROWN** walked from black Audi SUV and entered the front door, unlocking the door with keys.

r.      At 5:27 pm, **BROWN** walked out of the house and appeared to be waiting on the porch holding two cellphones, one of which had a red and white case (See Exhibit #23 & #24). **BROWN** was wearing designer black jeans with a label on the back pocket that appear to read "PRVTLBL" and a black and grey Louis Viton belt. After a brief moment, **BROWN** then walked back into the residence.

 

(Exhibit #23 & #24 – **Marcus BROWN**)

s.      At 5:32 pm, a black Honda sedan backed into the driveway.
**MONTGOMERY** walked out of the front door and towards the Honda.
**MONTGOMERY** got into the back seat of the Honda and left the door open.

t.      At 5:34 pm, **MONTGOMERY** exited the back seat of the Honda with a
black bag in his hands and walked onto the porch of the residence and then
entered the front door. **MONTGOMERY** appeared to have purchased marijuana.
The Honda then departed.

u.      At 5:34 pm, **BROWN** exited the residence and waved down the Honda
while holding two cellphones. **BROWN** spoke to **MONTGOMERY** who stated,

"I'm calling him". **BROWN** started counting money while on the porch.
**BROWN** then waited for the Honda to return. When the Honda returned,
**BROWN** opened the front passenger door and leaned into the vehicle. While
**BROWN** was interacting with the Honda, **MONTGOMERY** exited the front
door and stood on the porch for a moment then approached the Honda for a
moment before returning to the residence and entering through the front door. At
5:36 pm, **BROWN** returned to the residence, entering through the front door and
appearing to have purchased marijuana. The Honda then departed.

v.      At 5:39 pm, **MONTGOMERY** exited the front door holding a cellular
telephone and walked toward where the white Buick SUV that was parked in the
street in front of the residence. **MONTGOMERY** returned to the residence one
minute later again carrying a cellphone. As **MONTGOMERY** entered the front
door he reached into his pocket and at the same time a car horn can be heard and
the lights on the white Buick SUV flashed.

w.      At 5:46 pm, a black Honda Pilot SUV arrived and parked in the driveway
of the residence. **BROWN** then walked out of the residence and entered the front
passenger seat of the Honda SUV. **BROWN** was in the vehicle for less than one
minute and then returned to residence. The black SUV then departed. Based upon
your affiant's training and experience and the previous law enforcement
surveillance of **BROWN,** this brief meeting was a suspected drug transaction.

x.      At 6:10 pm, **BROWN** walked out of the front door and up driveway
toward where the BLACK AUDI SUV was parked. The white Buick SUV
operated by **MONTGOMERY** was still parked in front of residence on street.

29

y.      At 6:17 pm, **BROWN** departed in BLACK AUDI SUV.

z.      At 6:22 pm, a black male with long hair, a beard, glasses, and all dark clothing arrived at the residence and knocked on the front door. With no immediate answer at the front door after knocking, this male retrieved a cellphone from his pocket and appeared to begin operating the device. This male departed at 6:27 pm.

aa.     At 7:03 pm, a black male wearing a white t-shirt, dark pants, and white tennis shoes carrying a **BROWN** bag walked onto the front porch and immediately entered the front door without knocking or using keys. This male departed at 7:31 pm no longer carrying the **BROWN** bag and was heard stating "still making six, seven (inaudible)".

bb.     At 7:44 pm, **R.H.** arrived in the red Jeep Grand Cherokee, backed into the driveway, and entered through the front door using keys. **R.H.** was wearing white tennis shoes, jeans, a white T-shirt with a red logo on the front and a mostly yellow colored ball cap.

cc.     At 7:51 pm, **R.H.** walked out of the front door and to the side of the residence out of view. **POTEAT** exited the front door holding a cellphone and followed **R.H.**  **R.H.** appeared to take a black bag to the trash and then stood in the driveway speaking to **POTEAT**.  **R.H.** then posed for photographs as **POTEAT** took several photos of **R.H.** using a cellphone. **R.H.** was holding a cellphone as he posed for the photos. The license plate on the red Jeep Grand

Cherokee was clearly observed as state of New York LJL5436[13] (See Exhibit #25). Both **POTEAT** and **R.H.** then walked back in the front door of the residence moments later. At 7:52 pm, **POTEAT** and **R.H.** returned to the residence and entered through the front door.



(Exhibit #25 – **Deonte POTEAT and R.H.**)

dd.     At 8:06 pm, **POTEAT** exited the front door, walked to the street, and then returned approximately 10 minutes later and entered the front door using keys to

---

[13] (NY)***5436 – Jeep Grand Cherokee registered to PV Holdings (rental vehicle). Avis Budget Rent-A-Car provided that the vehicle was rented by an E.M. (a person known to investigators but not mentioned herein) of a residence on E. 114th St. Cleveland, Ohio. This vehicle was overdue its return date.

gain entry and he can be heard yelling "get that money, get that money…"
although he does not appear to be speaking to anyone.

ee.      At 8:17 pm, **MONTGOMERY** exited the front door and departed in the
white Buick SUV.

ff.      At 8:36 pm, **MONTGOMERY** returned to the residence entering through
the front door with keys. **MONTGOMERY** was carrying food and beverage
items. As **MONTGOMERY** approached the front porch, the lights on the white
Buick SUV were lit up as the white Buick SUV was parked in the street in front
of the residence.

gg.      At 9:18 pm, **POTEAT** exited the front door and walked towards the street
and out of view.

hh.      At 9:24 pm, **R.H.** exited the residence and departed in the red Jeep Grand
Cherokee.

ii.      At 9:28 pm, **MONTGOMERY** walked out of the residence and locked
the door with keys and walked towards the white Buick Enclave while holding a
cellphone.

jj.      At 10:59 pm, **MONTGOMERY** arrived in the white Buick Enclave and
backed into the driveway. He entered through the front door using keys. He was
carrying a black plastic bag and a cellphone.

kk.      At 11:38 pm, **BROWN** arrived in the BLACK AUDI SUV and parked in
the street. **BROWN** entered the residence through the front door using keys.

ll.      At 11:54 pm, **BROWN** exited the front door and walked toward the
BLACK AUDI SUV parked in the street with a cellphone in hand.

32

19. Law enforcement reviewed the Vivint Security System module video clips from August 31, 2025. The following is a summary of what investigators observed on August 31, 2025. All of the times are approximate and the video which is stored in ATF evidence is the most accurate representation of the activity described below.

a. At 12:10 am, **MONTGOMERY** walked out of the front door and secured the interior and exterior storm doors with keys while carrying a black bag and wearing what appeared to be a Nike long sleeve zip up as shown in Exhibit #26. He walked to the white Buick SUV parked in the driveway and entered the vehicle. **MONTGOMERY** departed in the white Buick SUV approximately 19 minutes later.



(Exhibit #26 – **Terence MONTGOMERY**)

b.      At 12:34 pm, **BROWN** arrived at the residence in the BLACK AUDI

SUV and entered the residence through the front door using keys and holding

multiple cellular telephones, one of which appeared to be red in color. He was

wearing an all blue Addidas sweatsuit and white tennis shoes (See Exhibit #27).



(See Exhibit #27 – **Marcus BROWN**)

c.      At 1:02 pm, **BROWN** walked out of residence and went to the BLACK

AUDI SUV. **BROWN** opened the back hatch to the SUV. **BROWN** then returned

to the residence and entered the front door carrying a beverage and a small dark

colored bag.

d.      At 1:16 pm, **BROWN** exited the front door wearing the same blue Adidas

tracksuit pants and a white t-shirt and walked to a silver sedan parked in the street

in front of the residence. **BROWN** entered the front passenger seat of this sedan

(See Exhibit #28). **BROWN** was in this vehicle for a short time and then returned

to the residence. Based upon your affiant's training and experience and the previous law enforcement surveillance of **BROWN**, this brief meeting was a suspected drug transaction.



(Exhibit #28 – **Marcus BROWN**)

e.        At 1:50 pm, **BROWN** exited the front door of the residence. **BROWN** was on the phone. He had two cellphones in his hands. He locked the front door with keys. **BROWN** then departed in the BLACK AUDI SUV.

f.        At 2:58 pm, **POTEAT** arrived in a silver Hyundai Palisade, parked in the driveway and entered the residence through the front door.  He used keys to gain

35

entry and had one white or grey colored cellphone in his hand with a home screen that was a photograph of two people with a grey background. Approximately six minutes later, **POTEAT** exited the residence and departed in the silver Hyundai Palisade.

g.       At 3:06 pm, **BROWN** arrived and parked the BLACK AUDI SUV in the street in front of the residence. He entered the residence through the front door, using keys to unlock the door. A cellphone could be heard ringing as he entered the residence. Approximately, two minutes later**, BROWN** exited the front door of the residence and departed in the BLACK AUDI SUV.

h.       At 3:23 pm, **POTEAT** arrived in the silver Hyundai Palisade and parked in the driveway. **POTEAT** then approached this residence carrying two black Apple iPhones, one clearly has a stock Apple iPhone home screen and entered the front door with keys (See Exhibit #29).



(Exhibit #29- **Devonte POTEAT**)

i.        At 3:25 pm, **POTEAT** exited the front door and returned to the silver

Hyundai Palisade while carrying a cell phone in his hand and departed. **BROWN**

arrived and parked the BLACK AUDI SUV in front of the residence.

j.        At 3:38 pm, **POTEAT** arrived and approached the residence operating a

black flip cell phone and having approximately three additional cell phones in

hand to include several dark colored cell phones and one light colored cell phone

as he approached the front door (See Exhibit #30). **POTEAT** entered the front

door using keys.



(Exhibit #30 – **Devonte POTEAT**)

k.      At 3:54 pm, **R.H.** arrived and parked the red Jeep Grand Cherokee in the driveway. He entered through the front door, using keys to unlock the door. The BLACK AUDI SUV drove away from the location in front of the residence where it was parked.

l.      At 3:55pm, **R.H.** exited the front door and departed in the red Jeep Grand Cherokee.

m.      At 4:02pm, **BROWN** met with a black male identified as J.S. (a person identified by investigators) who was wearing a black t-shirt and jeans and medical boot on his left lower leg and arrived in a black SUV. The two embraced in the driveway. After several minutes, **BROWN** and J.S. departed in J.S.'s black SUV. They returned a short time later and remained outside of the residence (See Exhibit #31).



(Exhibit #31 – **Marcus BROWN** and J.S.)

n.      At 4:27 pm, **POTEAT** exited the residence and walked past **BROWN** and J.S. towards the street. **POTEAT** did not appear to engage with **BROWN** or J.S. A moment later, **POTEAT** returned to the residence and as he walked past **BROWN** and J.S., **POTEAT** shook hands with J.S. and was heard addressing J.S. as "J-Rock" before entering the front door.

o.      At 4:44 pm, **R.H.** arrived, spoke to **BROWN** and J.S., and then entered the front door of the residence, using a key to unlock the door.

p.      At 4:50 pm, J.S. departed in the black Volkswagen SUV.

q.      At 4:51 pm, **BROWN** entered the residence with a black female wearing a blue sweatsuit and they entered the residence through the front door.

r.      At 4:53 pm, **R.H.** and **BROWN** walked out of the front door. **R.H.** walked to the red Jeep Grand Cherokee carrying white tennis shoes and **BROWN** remained on the front porch and then walked back in the front door a moment later.

s.      At 4:56 pm, the previously mentioned female walked out of the front door and to the BLACK AUDI SUV parked in the driveway. Approximately three minutes later, **BROWN** exited the residence and departed in the BLACK AUDI SUV.

t.      At 6:35 pm, **R.H.** arrived in the red Jeep Grand Cheroke, parked in the driveway, and entered the residence through the front door. He unlocked the door with keys. **R.H.** was not wearing a shirt and was wearing black sweatpants and black and white tennis shoes.

u.      At 6:39 pm, **MONTGOMERY** arrived parking the white Buick SUV in the street in front of the residence. He approached the front door carrying multiple bags, a beverage bottle, and a cellphone. He was talking to a male on the cellphone while he unlocked the front door with keys. A minute later, **MONTGOMERY** ran out of the house and to the backyard with a cellphone in hand. Law enforcement is unsure why **MONTGOMERY** ran to the back yard. Moments later he returned to the front of the house and entered the front door.

v.      At 6:53 pm, **POTEAT** arrived at the residence and approached the front door carrying a **BROWN** bag and two cell phones to include a dark colored cell phone and a white or grey cellphone. **POTEAT** used keys to enter the front door.

w.      At 6:59 pm, **R.H.** exited the front door and departed in the red Jeep Grand Cherokee.

x.      At 7:33 pm, **BROWN** arrived in the BLACK AUDI SUV and entered the residence through the front door. He unlocked the door with keys. **BROWN** was now wearing a black t-shirt with a white animal like logo on the front and back and dark colored pants and shoes as shown in Exhibit #32. Approximately two minutes later, **BROWN** exited the residence and returned to his vehicle and departed.



(Exhibit #32 – **Marcus BROWN**)

y.    At 7:40 pm, **MONTGOMERY** exited the residence and walked to a dark colored SUV that was waiting in the street in front of the residence. **MONTGOMERY** met with the occupants of this SUV and ultimately reached his arm/hand into the driver's window of the vehicle. Based upon my training and experience, this activity was perceived to be a suspected drug transaction (See Exhibit #33).



(Exhibit #33 – **Terence MONTGOMERY**)

z.    8:42 pm, **MONTGOMERY** arrived in the white Buick SUV and parked in front of the residence. He entered the residence through the front door wearing a dark colored sweatsuit and white tennis shoes. He was carrying a white plastic bag, red box or cellphone, and some kind of package.

42

aa.　　At 8:42 pm, **POTEAT** exited the front door carrying a key ring and cellphone.

bb.　　At 9:00 pm, **POTEAT** walked back into the residence through the front door, unlocking the door with keys, and carrying what appeared to be a white plastic bag and a cellular telephone.

cc.　　At 10:13 pm, unknown black male entered the residence through the front door while carrying a cellphone.

20.　　Law enforcement reviewed the Vivint Security System module video clips from September 01, 2025. The following is a summary of what investigators observed on September 01, 2025. All of the times are approximate and the video which is stored in ATF evidence is the most accurate representation of the activity described below.

a.　　At 12:31 am, **POTEAT** exited the residence carrying a plastic bag and accompanied by an unknown male. **POTEAT** cleaned up some bottles that were left on the front porch. The lights on the white Buick SUV went on and the vehicle appeared to start as if activated by a remote starter. **MONTGOMERY** then exited the front door and used to keys to secure both the interior and exterior door. The three males stood at the end of the driveway conversing.

b.　　At 12:33 am, **MONTGOMERY** walked back in through the front door, using keys to unlock both the exterior and interior door. Approximately three minutes later, **MONTGOMERY** exited the front door, carrying a food container and a **BROWN** paper bag. He locked both the interior and exterior door again. The males continued to converse at the end of the street while **MONTGOMERY**

43

emptied bags in the vacant field next to the house; unknown to investigators what the purpose for emptying bags in the field next to the house was.

c.        At 2:26 pm, **POTEAT** arrived at the residence, parking a grey Hyundai Kona in the street in front of the residence and approaching the front door carrying multiple cell phones to include a black cell phone and a silver or grey cellphone. **POTEAT** used keys to enter the front door.

d.        At 4:11 pm, **BROWN** arrived at the residence and parked the BLACK AUDI SUV in the driveway. He approached the front door wearing a white Perry Ellis designer T-shirt, black sweatpants, and black and white tennis shoes. **BROWN** was holding a red and white cellphone and a black cellphone. He used keys to enter the front door. (See Exhibit #34)



(Exhibit #34 – **Marcus BROWN**)

e. At 4:30 pm, **BROWN** exited the front door and walked toward the BLACK AUDI SUV.

f. At 4:48 pm, an unknown black male wearing all black approached the front door carrying a cellphone.

g. At 5:19 pm, the above-mentioned unknown male departed. This male returned approximately three minutes later and entered the front door.

h. At 5:43 pm, **BROWN** exited the BLACK AUDI SUV and entered the front door with keys and carrying two cellphones.

i. At 5:49 pm, the previously mentioned unknown black male in all black exited the residence.

j. At 5:51 pm, **POTEAT** exited the front door carrying a cell phone and keys and walked to the grey Hyundai Kona parked on the street in front of the residence.

k. At 6:13 pm, **BROWN** exited the front door and walked to the BLACK AUDI SUV. Approximately one minute later, **BROWN** walked back into the house through the front door.

l. At 6:16 pm, **POTEAT** returned to the residence and parked the grey Hyundai Kona in the driveway. He approached the front door carrying three cell phones: a black smart phone, a white or grey smart phone, and a grey or black flip cell phone. **POTEAT** used keys to enter the front door. Three minutes later, **POTEAT** exited the front door carrying a cellphone and keys and got into the grey Hyundai Kona. Approximately, six minutes later, **POTEAT** returned to the residence, approached the front door with keys and three cell phones in hand: a dark grey flip cell phone, a white or grey smart phone, and a black smart phone. **POTEAT** used keys to enter the front door.

45

m. At 6:29 pm, **BROWN** exited the front door carrying cellphones and keys. He went to **BLACK AUDI SUV**.

n. At 6:37 pm, a black male, later identified as D.W. (a person identified by investigators) parked a newer model grey colored Toyota Tundra[14] in the driveway and walked in the front door with an orange and black shoe box. Approximately one minute later this male exited the front door carrying what appeared to be the same shoe box and went back to the grey Toyota Tundra truck. (See Exhibit #35)



(Exhibit #35 – D.W.)

o. At 7:49 pm, **POTEAT** exited the front door with keys and a cell phone in hand. Moments later, **POTEAT** exited the Hyundai Kona which was parked on the street in

---

[14] A truck matching the exact description of this vehicle was later observed by law enforcement being operated by Kardell **HENDERSON** at his residence addressed ***0 Copley Rd., Solon, Ohio as detailed later in this affidavit.

46

front of the residence and ran back to the front door. **POTEAT** had a cell phone and keys in hand. He used the keys to enter the front door. Moments later **POTEAT** exited the front door again this time carrying an orange shoe box similar to the shoe box previously mentioned carried into the residence by D.W. and returned to the Hyundai Kona. (See Exhibit #36). A very short time later, **POTEAT** returned to the residence.



(Exhibit #36 – **Devonte POTEAT**)

p.  At 7:53 pm, **HENDERSON** walked out of the residence and to the white Volvo XC90.

q.  At 8:02 pm, **R.H.** walked away from the red Jeep Cherokee at the same time you can here a car horn beep as if he was locking the vehicle. **R.H.** then approached the front

door and unlocked the front door with keys. Approximately three minutes later **R.H.** exited the residence.

r.  At 8:22 pm, **R.H.** returned to the residence carrying multiple beverage containers. While he approached the front door a phone was heard ringing and then **R.H.** reached in his pocket and retrieved a cellphone. **R.H.** answered the phone as he entered the residence.

s.  At 8:37 pm, **POTEAT** returned and entered the front door with keys.

t.  At 8:50 pm, **R.H.** exited the residence and went to the red Jeep Cherokee that was parked in the driveway. **R.H.** walked back in the front door approximately one minute later.

u.  At 10:08 pm, **HENDERSON** approached the residence from the white Volvo XC90 which was parked in the driveway and entered through the front door with the use of keys. He was holding approximately three cellphones as he entered the residence. (See Exhibit #37). Approximately two minutes later, **HENDERSON** exited the residence and went back to the white Volvo XC90 SUV.



(Exhibit #37 – **Kardell HENDERSON**)

    v.   At 10:27 pm, **R.H.** returned to the residence carrying multiple white bags and entered through the front door.

    21.    Law enforcement reviewed the Vivint Security System module video clips from September 02, 2025. The following is a summary of what investigators observed on September 02, 2025. All of the times are approximate and the video which is stored in ATF evidence is the most accurate representation of the activity described below.

    a.    At 12:27 am, **POTEAT** exited the front door at the same time as Kardell **HENDERSON**. **POTEAT** was carrying a white plastic bag and two cell phones. He locked the front door upon exiting with keys that he had in his hand. (See Exhibit #38)

49



(Exhibit #38 – **Devonte POTEAT**)

b. At 11:18 am, **BROWN** and **HENDERSON** arrived at the residence. The BLACK AUDI SUV and white Volvo XC90 were parked in the driveway. **BROWN** was wearing a white T-shirt, black sweatpants, and black and white shoes. **HENDERSON** was wearing jeans with distinguishable tears, a white T-shirt, and blue tennis shoes. **BROWN** opened the front door with keys and while he was doing so a phone was heard ringing. **BROWN** reached in his pants pocket and retrieved two cellphones. **BROWN** answered a cellphone as he entered the house. **HENDERSON** followed him into the residence. (See Exhibit #39)



(Exhibit #39 – **Marcus BROWN and Kardell HENDERSON**)

c.  At 11:22 am, **BROWN** exited the front door while holding and talking on a cellphone.

**BROWN** was heard yelling back into the house, "you com'n down (inaudible)" and a

moment later **HENDERSON** exited the front door. **BROWN** appeared to walk toward

the BLACK AUDI SUV. **HENDERSON** walked to the white Volvo XC90 and

backed out of the driveway.

d.  At 12:41 pm, **HENDERSON** parked the white Volvo XC90 in the driveway and

entered the front door. Approximately two minutes later, **HENDERSON** exited, went

back to the white Volvo XC90, and backed out of the driveway.

e.  At 1:06 pm, **BROWN** parked the BLACK AUDI SUV in the driveway. He unlocked

the front door with keys while he was holding two cellphones, one of which was white

and red. Approximately one minute later, **BROWN** exited the residence, locking the

51

front door with keys. He was carrying two cellphones. **BROWN** then went back to the BLACK AUDI SUV and started the vehicle.

f.  At 1:48 pm, **BROWN** arrived at the residence with an unknown male who was wearing a green hoodie, jeans, white tennis shoes, and tan colored ball cap. **BROWN** unlocked the front door with keys. The unknown male followed **BROWN** into the residence.

g.  At 2:01 pm, **HENDERSON** arrived at the residence. He used keys to enter the front door. **HENDERSON** had a cellphone in his hand as he approached the front door and then placed the cellphone in his pants pocket as he entered the residence.

h.  At 2:07 pm, **BROWN** walked the previously mentioned unknown male in the green hooded sweatshirt out the front door where the two exchanged greetings.

i.  At 2:41 pm, **BROWN** exited the front door and walked to the BLACK AUDI SUV. He was carrying two cellphones when he exited the residence. Approximately three minutes later, **HENDERSON** exited the residence carrying and talking on a cellphone.

j.  At 3:48 pm, **R.H.** arrived. He was observed at the driver's window of an occupied black sedan that was parked in the driveway. As **R.H.** approached the front door the black sedan departed. A red Jeep Grand Cherokee was parked in the street in front of the residence.

k.  At 3:58 pm, **POTEAT** arrived at the residence and was carrying keys and three cell phones as he approached the front door: a white or grey cellphone, a black cellphone, and a dark grey flip cell phone. **POTEAT** used keys to enter the front door. Approximately eight minutes later, **POTEAT** exited the front door carrying a cell phone and keys.

l.  At 4:04 pm, **MONTGOMERY** arrived at the residence wearing black pants, a white t-shirt, and carrying a black jacket and a cellphone. Approximately two minutes later **POTEAT** exited the front door carrying a cellphone and key ring.

m.  At 4:28 pm, a black male with long hair arrived and entered the front door. This male was later identified by law enforcement as J.I. (a person identified by law enforcement)[15]. He was wearing dark colored pants, a white t-shirt, and dark colored shoes. This male was carrying a black bag and had a white glove on his left hand. Approximately two minutes later, **R.H.** exited the residence.

n.  At 4:37 pm, **MONTGOMERY** and J.I. exited the residence. **MONTGOMERY** locked the front door with keys. **MONTGOMERY** and J.I. were heard conversing and **MONTGOMERY** was heard stating, "this shit for sho will make you hungry, yea, (inaudible) and "this shit make me go get hella snacks for show (inaubile) " as J.I. responded, "I got me some real shit". **MONTGOMERY** then stated "but the fake shit…" then the video stopped recording. **MONTGOMERY** was carrying a black bag and a beverage bottle.

o.  At 4:39 pm, **R.H.** entered the front door with keys. He was talking on a cellphone as he entered the residence. This cellphone appeared to have a blue case.

p.  At 4:40 pm, **POTEAT** returned to the residence and as he approached the front door, he had four cellphones in his hand to include a cellphone that was white or silver in color. He used keys to enter the front door.

---

[15] Law enforcement later identified this male as J.I. and is believed to be of family relation to Terence **MONTGOMERY**.

q.  At 4:55 pm, an unknown heavy set black male with a grey and black sweatsuit approached the front door and knocked. He was holding a cellphone. Approximately six minutes later this male exited the front door.

r.  At 5:00 pm, an unknown black male with long hair, wearing a black coat, grey sweatpants, and black tennis shoes walked up to the front door and someone from the inside opened the door for this male as he entered the residence. Approximately one minute later this male exited and walked towards the street and out of view.

s.  At 5:22 pm, **R.H.** exited the residence and walked toward the same black sedan as previously mentioned on this day. **R.H.** walked to the driver's window of this sedan and reached into the driver window of the black sedan with his left hand. He then gave the driver of this vehicle and handshake with his right hand and immediately returned to the residence and entered the front door. Based upon your affiant's training and experience this behavior of exiting the residence, having a brief interaction with this car, reaching into the vehicle as to hand something to the driver with one hand and then shaking their hand with the other hand and then immediately returning to the residence is consistent with a drug transaction. (See Exhibit #40)



(Exhibit #40 – **R.H.**)

t.  At 5:28 pm, **HENDERSON** approached the front door talking on a cellphone with keys in his hand.

u.  At 5:37 pm, **R.H.** and **HENDERSON** exited the front door together. **R.H.** walked to the red Jeep Grand Cherokee and **HENDERSON** walked to the white Volvo XC90.

v.  At 6:54 pm, an unknown black male wearing a dark colored ball cap, white t-shirt, dark colored pants, and dark colored tennis shoes walked onto the front porch with papers in his hand. The white Buick SUV was parked in the street in front of the residence and the BLACK AUDI SUV was parked in the driveway. The unknown

55

male was heard speaking to someone, but it is unknown who he is speaking to. **MONTGOMERY** then walked away from the white Buick SUV and walked past the unknown male on the front porch. **MONTGOMERY** was holding and talking on a cellphone. **MONTGOMERY** used keys to enter the front door. The unknown male then walked into the residence. The next video clip was approximately three minutes later and the red Jeep Grand Cherokee was now parked in the driveway in front of the BLACK AUDI SUV. **R.H.** walked from the red Jeep Grand Cherokee and entered the front door while he was talking on a cellphone with a blue case. As **R.H.** was walking into the residence, the BLACK AUDI SUV was backing out of the driveway. **R.H.** then walked back out of the front door talking on a cellphone. At 7:02 pm, two females walk up to the front porch where **R.H.** is talking on a cellphone. **R.H.** then entered the front door with the two females.

w.  At 7:25 pm, **MONTGOMERY** exited the front door carrying a small black bag. As he exited the residence, **MONTGOMERY** was conversing with a female who was inside of the residence and stated "I got some little weed, I got a little bit, I don't sell it, I'm about to get y'all together" and then he walked to the white Buick SUV parked in the street in front of the residence. Three minutes later, **MONTGOMERY** walked back into the residence, again carrying the same black bag.

x.  At 7:28 pm, **HENDERSON** arrived and parked the white Volvo XC90 in the driveway. **HENDERSON** entered the front door holding and talking on a cellphone. Approximately five minutes later, **HENDERSON** exited the residence went to the white Volvo XC90.

y. At 7:35 pm, **MONTGOMERY** exited the residence and walked to the white Buick SUV.  He returned to the residence approximately one minute later and entered the front door while holding a cellphone.

z. At 7:46 pm, **BROWN** arrived and parked the BLACK AUDI SUV in the driveway. **BROWN** was holding and talking on a cellphone while he entered the front door with the use of keys. The cellphone was red and white. Three minutes later, **BROWN** walked out of the residence while talking on a cellphone. He was carrying a white and red box that he placed in the back seat of the BLACK AUDI SUV and then got into the driver's seat.

aa. At 8:14 pm, the previously mentioned females exited and the residence while **R.H.** walked them out.

bb. At 8:21 pm, **HENDERSON** arrived at the residence in a black SUV. He entered the residence with keys and was carrying a **BROWN** bag.

cc. At 8:43 pm, **HENDERSON** and **R.H.** exited the front door. **HENDERSON** went to the white Volvo XC90 and **R.H.** went to the red Jeep Grand Cherokee which were both parked in the driveway.

dd. At 8:59 pm, **BROWN** arrived at the residence and entered with keys while he was holding and talking on a cellphone.

ee. At 9:30 pm, a heavy-set male arrived and approached the front door will holding and using a cellphone. Someone from inside opened the door and lets this male into the house. Approximately four minutes later this male exited and **POTEAT** walked him out.

57

ff. At 9:39 pm, **BROWN** exited the residence and walked towards the street and out of view.

gg. At 10:15 pm, **BROWN** entered the front door using keys while he was holding and talking on a cellphone. Approximately one minute later, **BROWN** walked out of the residence, got into the BLACK AUDI SUV, and started the vehicle. **BROWN** then walked back into the front door using keys while holding and talking on a cellphone. An unknown male walked into the front door with **BROWN.**

hh. At 10:19 pm, **POTEAT** entered the front door with keys. He was holding and talking on a cellphone as he entered the residence. **POTEAT** had approximately four cellphones in his hand as he entered the residence.

ii. At 10:22 pm, **R.H.** walked into the front door using keys. He was holding a white bag when he entered the residence.

jj. At 10:27 pm, **BROWN** and the previously mentioned unknown male exited the residence. The unknown male entered a large SUV that was parked in the driveway and **BROWN** walked up the driveway and out of view.

kk. At 10:36 pm, **HENDERSON** approached the residence from the white Volvo XC90 which was parked in the driveway and entered the front door using keys. Approximately three minutes later, **HENDERSON** exited the residence and got into the white Volvo XC90.

ll. At 11:15 pm, **MONTGOMERY** exited the residence locking the door with keys. He was carrying a black bag and a cup. **MONTGOMERY** walked toward the white Buick SUV that was parked on the street in front of the residence. As he approached

58

the white Buick SUV, the lights on the vehicle flashed and it started as if he utilized the remote start function for the vehicle.

22.     On September 03, 2025, the video clips obtained from the Vivint home security module captured **POTEAT** exiting the front door carrying multiple cell phones at 12:36 am. He secured the door with keys and departed with **R.H**.  **R.H.** and **POTEAT** were heard talking and the conversation is partially audible. They were talking about "J-Rock" stating, "I walked outside and turned.. like what the *uck.. bro Ill see you tomorrow…"  and "I walked outside and saw that *igga like what the *uck… he *ucked me up with that one" (See Exhibit #41).  The next video captured by the Vivint home security system is law enforcement approaching the residence to execute a federal search at 6:12 am on this day, therefore, **POTEAT** and **R.H.** were the last known persons at the residence prior to law enforcement executing the search warrant.



(Exhibit #41 – **Devonte POTEAT**)

**Identification of Suspects**

23.     Law enforcement queried **BROWN, HENDERSON, R.H., MONTGOMERY, and POTEAT** through the Ohio Law Enforcement Gateway (OHLEG) and reviewed driver's license and identification card photographs on file for each of these males which assisted in identifying them on the video clips from the Vivint home security system module. Identifications were made through various means of investigation to include cross referencing vehicle license plates driven by the males to the residence with rental agreements, registrations, police reports, driver's license information, law enforcement open-source data resources as well as personal observations made by law enforcement who could personally recognize individuals based upon previous observations throughout this investigation.

**February 11, 2026-Execution of Search warrants at \*\*8 Sycamore Dr., Euclid, Ohio (POTEAT), \*\*\*8 Brookline Rd., South Euclid (BROWN), AND \*\*\*0 Copley Ave., Solon, Ohio (HENDERSON)**

24.     Next, investigators identified \*\*8 Sycamore Dr., Euclid, Ohio as the suspected residence of **POTEAT**; \*\*\*8 Brookline Rd., South Euclid, as the suspected residence of **BROWN**; and \*\*\*0 Copley Ave., Solon, Ohio, as the suspected residence of **HENDERSON**. On February 2, 2026, investigators obtained search warrants authorizing the search of the Sycamore Dr., Brookline Dr., and Copley Ave. addresses for evidence of violations of federal drug laws (21 USC 841 (a)(1), 846, 856(a)(1) and 843(b))[16].

---

[16] These warrants included additional properties not specifically mentioned herein, and included follow up warrants with additional authorizations as pertinent Brookline and Copley based on drug observation during the initial warrant.

25.     On February 11, 2026, investigators executed the above-mentioned warrants at the Sycamore Dr., address of **POTEAT**, the Brookline Rd. residence of **BROWN**, and Copley Ave. residence of **HENDERSON**.

**February 11, 2026-Execution of Search warrant at \*\*8 Sycamore Dr., Euclid, Ohio (POTEAT)**

26.     At the execution of the search warrant at the Sycamore residence, investigators found Devonte **POTEAT**, his girlfriend (T.P.), and four children present inside of the residence. Once the residence was secured, investigators began searching and discovered a firearm (HS Produkt, model Hellcat, 9mm semi-automatic pistol bearing serial number AT231013), ammunition, and bulk US currency in the amount of $11,262.00. Additionally, investigators recovered seven cellphones, keys, and clothing items. Of the cellphones found, one cellphone was confirmed as servicing 216-403-\*\*15 which was a cellphone number investigators had previously associated with being used by **POTEAT** through physical surveillance, jail calls, and records provided by the wireless provider and rental vehicle agencies. Of the clothing items recovered, investigators found Jordan 10 retro light steel grey colored tennis shoes in size 10, black Nike sweatpants (Exhibit #42) and grey Nike sweatsuit (Exhibit #43) of which all match the clothing worn by **POTEAT** in the video surveillance obtained by law enforcement from the previously mentioned search warrant executed at the drug stash house addressed \*\*\*9 E. 134th St., East Cleveland, Ohio on September 03, 2026.



(Exhibit #42)



(Exhibit #43)

27.     While at **8 Sycamore Dr., investigators also executed a federal search warrant to collect a DNA sample from Devonte **POTEAT**. This sample was submitted to Ohio BCI

62

forensic laboratory to be compared against the DNA collected from the items recovered at ***9 E. 134th St., East Cleveland, Ohio on September 03, 2025.

28.     Additionally, investigators executing the search warrant at **8 Sycamore Dr. determined that T.P. and **POTEAT** shared the master bedroom and that they had resided at this residence since 2022 based upon observations of clothing and household items as well as voluntary statements made by **POTEAT** and T.P. T.P. also voluntarily stated to investigators that the firearm belonged to her and that she purchased this firearm four or five years ago at Parma Armory. According to ATF firearms tracing, this firearm was not purchased by T.P. from a federally licensed dealer and was instead purchased by a male, not known to this investigation, from a federally licensed on October 24, 2019 in Canton, Ohio.

29.     Investigators conducted a custodial recorded interview with **POTEAT**. **POTEAT** was advised of his Miranda Rights of which he stated he understood. During investigators conversation with **POTEAT** stated that he resided at the residence with his girlfriend and has lived there for about one year.  Investigators additionally asked **POTEAT** if his DNA was going to be on the recovered firearm and he stated that it may be because he has unloaded it before.

### February 11, 2026-Execution of Search warrant at ***8 Brookline Rd., S. Euclid (BROWN)

30.     At the Brookline Rd. residence, during the execution of the search warrant, investigators found the residence to be solely occupied by M.L. on November 11, 2026. M.L.  is the adult son of Marcus **BROWN**.

31.     Upon executing the federal search warrant at ***8 Brookline Rd. and upon the initial sweep of the residence investigators observed what they perceived to be drug preparation, distribution, and manufacturing equipment with residue in the basement on top of a freezer chest.

These items included a digital scale with residue, plastic covers to digital scales with white powder residue, a razor blade with residue, and sandwich bag box (See Exhibit #44).



(Exhibit #44)

32.     Next to the freezer chest was a brown box that appeared to contain sifters, a press, plastic wrap, additional scales, a blender, and other items (See Exhibit #45).



(Exhibit #45)

33.     The search was halted and investigators obtained an additional court authorized search warrant. Investigators then resumed searching the residence once the additional search warrant was obtained and they discovered a black book bag in the basement of the residence containing a several plastic bags containing approximately **38.8 grams** of cocaine base ("crack"), **587.35 grams** of Cocaine, **59.62 grams** of Fentanyl, **137.85 grams** of a mixture containing Cocaine and Fentanyl, and a **1,003.84 gram** block of Cocaine compressed white powder and small particles with a "TNT" imprint (See Exhibit #46)[17].

---

[17] As result of the substances found being submitted to the CCRFSL who provided a Drug Chemistry Laboratory Report-the results of which are listed herein.



(Exhibit #46)

34.     Later, DNA analysis of swabs obtained from the zipper and straps of the black backpack identified the presence of **BROWN's** DNA. This identification was made based upon **BROWN'S** DNA profile contained within a database.

35.     Investigators continued to search the residence addressed ***8 Brookline Rd., and they discovered clothing that matched the clothing **BROWN** was observed wearing on the

surveillance video recovered from the search warrant executed at the drug stash house addressed ***9 E. 134th St. on September 03, 2025 to include:

- A black sweatshirt with a white image of an animal (See Exhibit #47)



(Exhibit #47)

- A pair of black Nike "Supreme" sweatpants (See Exhibit #48)

67



(Exhibit #48)

- A blue Addidas tracksuit (See Exhibit #49)



(Exhibit #49)

- A pair of black and red Nike Jordan tennis shoes (See Exhibit #50)



(Exhibit #50)

- A light-colored Gallery Dept. hooded sweatshirt and a black Louis Vuitton belt

   (See Exhibit #51)



(Exhibit #51)

69

- A pair of Nike tennis shoes that are mostly dark colored with a white strap and the Nike logo over the top (See Exhibit #52)

 

(Exhibit #52)

36.     Additionally, investigators found a vacuum sealer, bank/credit cards with Marcus **BROWN**'s name on them, a paper copy of Marcus **BROWN**'s State of Ohio identification card, articles of mail addressed to Marcus **BROWN** at an address on E. 95th St., Cleveland, Ohio and at ***8 Brookline Rd., prescription bottle with Marcus **BROWN**'s name on the label, plastic packaging with residue believed to be packaging for kilogram quantities of narcotics, a loaded pistol, and $6,020.00 in US currency, and two cellular telephones.

37.     Majority of the clothing items, shoes, US currency, and prescription bottle with **BROWN**'s name on it were found in the first-floor master bedroom. In this room investigators also discovered a Glock, model 29, 10mm semi-automatic pistol bearing serial number BRUF416.

38.     Investigators used cotton swabs to collect a DNA sample from the firearm (Glock, model 29, serial number BRUF416) recovered from the master bedroom in the residence

addressed ***8 Brookline Rd., S. Euclid, Ohio. Later, DNA analysis of swabs above mentioned

firearm identified the presence of BROWN's DNA. This identification was made based upon

BROWN'S DNA profile contained within a database.

**February 11, 2026-Execution of Search warrant at ***0 Copley Ave., Solon, Ohio (HENDERSON)**

39. At the Copley residence, investigators found Kardell **HENDERSON** at the

residence and a 2024 Toyota Tundra bearing Ohio license plate KFF3476 of which he is known

to drive and is registered to an LLC owned by his mother (R.W.) parked in the driveway.

Investigators conducted an initial search pursuant to the approved search warrant and discovered

several bags of marijuana, U.S. currency, and a pistol (HS Produkt, model XDS, 45 caliber,

semi-automatic pistol bearing serial number AT162612). The search was halted and investigators

obtained an additional court authorized search warrant. Investigators resumed searching the

residence and discovered an additional pistol (Polymer80 Inc., model PF940SC, 40 caliber, semi-

automatic pistol with no serial number), two Volvo key fobs[18], three 45 caliber pistol magazine

at different locations throughout the residence, eight cellular telephones, a money counter

machine, several bags of suspected marijuana, two digital scales, and several white pills wrapped

in a dollar bill[19]. Additionally, investigators observed artwork on the wall which was a

---

[18] Kardell **HENDERSON** was known to investigators to operate a white Volvo XC90 SUV, specifically of which law enforcement observed him parking in the driveway of ***9 E. 134th St., East Cleveland, Ohio the days prior to law enforcements search warrant of the drug stash house at that location.

[19] These pills were submitted to the CCRFSL for testing and tested positive as Oxycodone (Schedule II).

photograph of a male seated at a table with two pistols, rubber gloves, good senses sandwich bags[20], and other items (See Exhibit #53).



(Exhibit #53)

40.     Investigators also searched the Toyota Tundra pick-up truck parked in the driveway and discovered mail addressed to R.H. and D.W. (previously referenced herein) at an address on Greenvale Rd., S. Euclid, Ohio, mail addressed to R.H. and D.W. at an address on Empire Ave., Cleveland, Ohio; Kardell **HENDERSON's** driver's license and bank and/or credit cards belonging to Kardell **HENDERSON**; money order receipts; rent or utility bill payment receipt made out to Kardell **HENDERSON**; and Express Wireless cellphone receipt.

---

[20] Good Sense bags are commonly used by drug traffickers to package user quantities of drugs for distribution.

41.     They also discovered a black puffy jacket similar to that of which **HENDERSON** was observed wearing by law enforcement surveillance when entering and exiting ***0 Copley Rd. in the days leading up to the November 11, 2026 search warrant execution.

42.     Investigators used cotton swabs to collect DNA samples from the firearms located and these swabs were submitted to Ohio Bureau of Criminal Investigations (BCI). Investigators also executed a federal search warrant for Kardell **HENDERSON**'s DNA while on scene. His DNA was collected and these cotton swabs were also submitted to the BCI forensics laboratory.

43.     While searching the residence, investigators were looking for specific items of clothing which matched the video surveillance recovered from ***9 E. 134th St., East Cleveland, Ohio when they executed a federal search warrant at this location and discovered a drug stash house.  Upon searching ***0 Copley Ave., investigators additionally discovered:

- A pair of turquoise Asics running shoes (See Exhibit #54)



(Exhibit #54)

- A pair of Amir ripped jeans (See Exhibit #55)



(Exhibit #55)

- A Louis Vuitton belt (See Exhibit #56)



(Exhibit #56)

- Three white polo t-shirts (See Exhibit #57)

74



(Exhibit #57)

- A black puffy jacket with Moncler patch on the left sleeve (See Exhibit #58)



(surveillance image)                    (Exhibit #58)

**April 10, 2026, Ohio Bureau of Criminal Investigation & Identification DNA laboratory results of items obtained from the September 3, 2025, Execution of Search Warrant at \*\*\*9 E. 134th St., East Cleveland, Ohio.**

44.     As part of the follow-investigation of the September 3, 2025, search warrant execution and drug recovery at ***9 E. 134th St., East Cleveland, as described herein, investigators submitted multiple items recovered from within the home to the Ohio Bureau of Criminal Investigation and Identification (BCI) for potential DNA analysis, in an effort to identify the users of the address.  Many of the submitted items included items suspected to have been used in the drug trafficking activity at the address.

45.     On April 11, 2026, BCI issued a laboratory report as pertinent to the above refenced submitted items.  As a result of this analysis of items recovered during the September 3, 2025, search warrant execution at ***9 E. 134th St., East Cleveland, Ohio, the report made the following identifications of DNA profiles as described below[21]:

- Swab of exterior as found of a glove was found to contain a mixture and **BROWN** was found to be the major contributor. This item was located in the first bedroom of the residence addressed *** E. 134th St. as detailed above;

- Swab of exterior as found of a glove was found to contain a mixture and **BROWN** was found to be the major contributor. This item was located in the first bedroom of the residence addressed *** E. 134th St. as detailed above;

- Swab of interior as found of glove was found to contain a mixture and **BROWN** was found to be the major contributor. This item was located in the upstairs hallway of the residence addressed *** E. 134th St. as detailed above.

---

[21] The below reference DNA findings as pertinent to **HENDERSON** and POTEAT were made pursuant to profiles obtained from swabs of **POTEAT** and **HENDERSON** by investigators.  The above-referenced DNA findings as pertinent to **BROWN**, **MONTGOMERY** and **R.H.** were made based on profiles of **BROWN**, **MONTGOMERY** and **R.H.** contained in a database. Investigators intend to submit conformation swabs to be obtained from **BROWN**, **MONTGOMERY** and R.H., at a later time.

- Swab of stain on tissue paper was found to be consistent with **HENDERSON** (the estimated frequency of occurrence of the DNA profile is rarer than 1 in 1 trillion unrelated individuals). This item was located in the kitchen of the residence addressed *** E. 134th St. as detailed above;

- Swab of exterior as found of glove was found to contain a mixture and the major contributor was found to be consistent with **HENDERSON**'s (the estimated frequency of occurrence of the major DNA profile is rarer than 1 in 1 trillion unrelated individuals). This item was located in the kitchen of the residence addressed *** E. 134th St. as detailed above;

- Swab of mouth area of respirator was found to contain a mixture with the major contributor being **MONTGOMERY.** This item was located in the second bedroom of the residence addressed *** E. 134th St. as detailed above;

- Swab of the exterior as found of black glove was found to contain a mixture with the major contributor being consistent with **HENDERSON** (the estimated frequency of occurrence of the major DNA profile is rarer than 1 in 1 trillion unrelated individuals). This item was located in the second bedroom of the residence addressed *** E. 134th St. as detailed above;

- Swab of Exterior as found of glove was found to contain a mixture with the major contributor being R.H. This item was located in the second bedroom of the residence addressed *** E. 134th St. as detailed above;

- Swab of exterior as found of glove was found to contain a mixture with the major contributor being consistent with **POTEAT** (the estimated frequency of occurrence of the major DNA profile is rarer than 1 in 1 trillion unrelated

individuals). This item was located in the second bedroom of the residence addressed *** E. 134th St. as detailed above;

- Swab of Exterior as found of glove was found to contain a mixture with the major contributor being R.H. This item was located in the second bedroom of the residence addressed *** E. 134th St. as detailed above; and

- Swab of mouth area of recovered respirator was found to contain a mixture with the major contributor being **BROWN.** This item was located in the second bedroom of the residence addressed *** E. 134th St. as detailed above.

46.    Based on the circumstances of recovery and Affiant's training and experience Affiant knows in his training and experience, persons engaged in illegal drug sales commonly use similar gloves to protect themselves when preparing harmful drugs for sale, and or prevent later identification by law enforcement.  Likewise, Affiant knows in his training and experience that persons engaged in illegal drug sales will often employ similar respirators as to those referenced above in the cutting and mixing of drugs for later sale, as a form of self-protection from the harmful drugs they are working with**.**

47.    Based on Affiant's training and experience, and observations of the scene during the execution of the search warrant on September 3, 2025, at ***9 E.134th St., East Cleveland, Ohio, as described herein, the facts indicate that this location was used for the preparation of illegal controlled substances for sale.  Likewise, the amount of the controlled substances seized during the above referenced search warrant was consistent with distribution quantities.  The manner of package of the drug items seized during the above reference search warrant was consistent with drug trafficking such as larger quantities to broken down for later sale, and sellable quantities to end users, as described herein.  As described herein, the scene was rife with

items used in the preparation of drugs for later sale. Further, Affiant knows in his training and experience that fentanyl, cocaine, cocaine base ("crack"), methamphetamine, and 4anpp are Schedule II controlled substances. The identified controlled substances herein, are based on Affiant's review of drug chemistry lab reports.

## CONCLUSION

48. Based upon the above listed facts, your Affiant submits that there is probable cause to believe that Marcus **BROWN**, Kardell **HENDERSON**, Terence **MONTGOMERY**, and Devontae **POTEAT** on or about September 3, 2025, in East Cleveland, Ohio, Cuyahoga County and the Northern District of Ohio, committed a violation of federal law, namely: Possession with the intent to distribute 400 grams or more of fentanyl (21 U.S.C. Sections 841(a)(1), (b)(1)(A), and 18 U.S.C. Section 2); Possession with the intent to distribute 500 grams or more of cocaine (21 U.S.C. Sections 841(a)(1), (b)(1)(B), and 18 U.S.C. Section 2); Conspiracy to distribute and possess with intent to distribute 400 grams or more of fentanyl (21 U.S.C. Sections 841(a)(1), (b)(1)(A), and 846); and Conspiracy to distribute and possess with intent to distribute 500 grams or more of cocaine (21 U.S.C. Sections 841(a)(1), (b)(1)(B), and 846).

Therefore, Affiant requests that this Court authorize the requested Complaints and Arrest

Warrants for arcus **BROWN**, Kardell **HENDERSON**, Terence **MONTGOMERY**, and

Devontae **POTEAT**.

Respectfully Submitted,

Stephen J. McGrath
Special Agent
ATF

Sworn to via FaceTime after submission
by reliable electronic means. Crim.Rules.
4.1; 41(d)(3) this 18th day of May, 2026.



James E. Grimes Jr., United States Magistrate Judge

May 18, 2026

DATE